IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| OSIAN MORRIS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>VERIZON FEDERAL, INC., a Foreign<br>Profit Corporation; et al.,<br><br>                    Defendants. | Civ. No. 15-00261 JMS-KSC<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT, ECF<br>NO. 60 |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 60

## I.  INTRODUCTION

Plaintiff Osian Morris ("Plaintiff" or "Morris"), a current employee of Defendant Verizon Federal, Inc. ("Defendant" or "Verizon"), brings this action against Verizon seeking damages for hostile work environment, retaliation, and disability discrimination under both federal and state law.

Currently before the court is Defendant's Motion for Summary Judgment ("Defendant's Motion"), ECF No. 60.  For the reasons that follow, the court GRANTS in part and DENIES in part Defendant's Motion.

# II. BACKGROUND

## A. Factual Background

Verizon has two primary locations in Hawaii: (1) the 397 office at the Pearl Harbor Naval Base ("397"), where employees primarily work on installation and maintenance; and (2) Aiea, where employees primarily splice cables. Mattos Decl. ¶ 3, ECF No. 61-2. In February 2010, Plaintiff began working for Verizon as a splicing technician in Aiea. Morris Dep. 14:1-5, 36:2-37:16, Mar. 28, 2016, ECF No. 61-4. Beginning in February 2011, Plaintiff worked under Verizon employee Gordon Mattos ("Mattos"), the Outside Plant Supervisor at Aiea. Mattos Decl. ¶¶ 4, 6.

During a two-year period ranging from March 2011 to June 2013, Plaintiff alleges that she was "constantly subjected to . . . discriminatory epithets based on both my sex and my sexual orientation, as well as numerous derogatory comments from fellow employees and managers that they did not want to work with [her], that [she] should not be there, and other comments." Morris Decl. ¶ 6, ECF No. 80-2. Plaintiff "specifically recall[s] repeatedly hearing the terms, 'bitch,' 'gay,' 'dyke,' and 'faggot.'" *Id.*

Beginning in March 2011, at the start of this two-year period, Mattos assigned Plaintiff to a cable splicing project for Time Warner Cable, but in April

2011, Time Warner Cable informed Mattos that Plaintiff needed to be replaced.

Mattos Decl. ¶¶ 8, 9. Mattos then reassigned Plaintiff to 397, switching her with

an employee at 397 who had splicing experience. *Id.* ¶ 9.

### 1. *Plaintiff's Time at 397*

On April 18, 2011, Plaintiff began working at 397, where she joined

the troubleshooting group. *Id.* ¶ 13; Morris Dep. 47:23-25. The group consisted of

Plaintiff and approximately nine men, all of whom were supervised by Verizon

employee Tom Cathcart ("Cathcart"). Morris Dep. 73:24-75:17.

On November 4, 2011, Plaintiff filed an internal complaint regarding

two incidents that happened two months earlier. Mattos Decl. ¶ 18. First, on

September 23, 2011, Plaintiff told Cathcart that she believed he was treating her

unfairly after he assigned her more work that afternoon. Morris Dep. 148:13-

149:10. Cathcart replied: "I fucking bring you on my team. You fucking don't

appreciate. You better wake up." *Id.* 145:23-146:16. Second, on September 27,

2011, Plaintiff double parked her van along a fence outside of 397. *Id.* 151:4-12.

Although other Verizon employees were also double parked along the fence,

Plaintiff's van was blocking a gate. *Id.* 151:20-24. As Cathcart drove by Plaintiff

(still in her van), he called Plaintiff and told her to move her van. *Id.* 152:7-23.

Cathcart then parked his car, approached Plaintiff, and yelled at her to move her

van. *Id.* In response to Plaintiff's November 4, 2011 internal complaint, Cathcart was counseled to treat employees with respect. Ex. L, ECF No. 61-14.

On March 26, 2012, Mattos moved Cathcart to Aiea and promoted Verizon employee Manny Contreras ("Contreras") to acting supervisor at 397. Mattos Decl. ¶ 23. On July 10, 2012, Plaintiff filed an internal complaint concerning a couple of instances when Contreras greeted the group with "Good morning, men" during morning briefings. Llewellyn Decl. ¶ 9, ECF No. 61-3. On July 11, 2012, Verizon employee Deborah Llewellyn ("Llewellyn"), a support person in Human Resources ("HR"), contacted Plaintiff about her complaint. *Id.* ¶ 10. During the phone call, Plaintiff reiterated Contreras's greeting, and also requested that her group take classes on harassment and discrimination. *Id.* Verizon employee Dave Brown ("Brown"), Contreras's manager, counseled Contreras to avoid gender-based greetings and to instead use words such as "team." Ex. N, ECF No. 61-16. Plaintiff does not remember Contreras using gender-based greetings after she filed her internal complaint. Morris Dep. 157:9-12. In response to Plaintiff's request for a class, Llewellyn arranged for a "Respect in the Workplace" training, which was administered to all Verizon employees in Hawaii on August 22, 2012. Llewellyn Decl. ¶ 13, 15.

In August 2012, Plaintiff filed two separate internal complaints. The first complaint, filed on August 9, 2012, reported "misconduct in the workplace" regarding events on August 6, 7, and 8, 2012. Ex. O at 1, ECF No. 61-17. On August 6, 2012, Plaintiff attended a morning meeting with other Verizon employees, and Verizon employee Steven Chee ("Chee") "ma[de] comments to Clarence Lewis that he looks like he is going to be in the 'gay parade' and the rest of the team start[ed] to laugh." *Id.* at 2. The next morning, Chee made a "comment about grabbing Mr. Lewis by the shirt and bending him over." *Id.* And on August 8, 2012, AT&T supervisor Penny Bortman ("Bortman") "walked by [the Verizon employees'] table and said 'good morning fellas.'" *Id.*

The second complaint, filed on August 23, 2012, concerned comments made at that day's morning meeting (the morning after the "Respect in the Workplace" training). Ex. R, ECF No. 61-20. Contreras "announced to employees that Oliver Reyes had an announcement," and "Gabriel Preciado yelled out, that [Contreras] 'is coming out of the closet.'" *Id.* at 2. Contreras replied "Yeah, yeah, he's coming out of the closet." *Id.*

### 2. *Plaintiff Goes on Medical Leave for Work Stress*

On August 23, 2012, Plaintiff went out on medical leave for work stress. Llewellyn Decl. ¶ 17; Ex. UU, ECF No. 61-43.

During that time, Llewellyn and Verizon employee Theresa Boudet ("Boudet") launched an investigation in response to Plaintiff's August 2012 internal complaints. Llewellyn Decl. ¶ 18. Lewellyn and Boudet interviewed several Verizon employees between September 10 and October 2, 2012, including Glenn Gouveia, Brad Cathcart,[1] Harry Andaya, Van Kinilau, Darryl Goya, Noa Kaopuiki, Clarence Lewis, Steven Chee, and Gabriel Preciado. *Id.* On October 4, 2012, Llewellyn emailed Plaintiff to inform her that Verizon completed its investigation and would be "taking the appropriate steps to address the respective matters." Ex. EE, ECF No. 61-33. The next day, Chee and Preciado were given "a documented Verbal Warning for inappropriate and unprofessional conduct in violation of the Code." Llewellyn Decl. ¶ 23; *see also* Ex. FF, ECF No. 61-34; Ex. GG, ECF No. 61-35.

Plaintiff believed that Llewellyn's October 4, 2012 email meant that she could return to work, and Plaintiff subsequently attempted to return to work on October 5, 2012. Ex. VV, ECF No. 61-44. But it does not appear that anyone knew she was planning to return on that day. *See, e.g.*, Llewellyn Decl. ¶ 25; Mattos Decl. ¶ 25, 27; Morris Dep. 216:22-217:1.

---

[1] Not to be confused with Tom Cathcart, Brad Cathcart's brother.

Prior to her medical leave, Plaintiff had primarily used a specific Verizon "bucket truck" for her job. Mattos Decl. ¶ 25. Because there were a limited number of bucket trucks, Mattos allowed other Verizon employees to use Plaintiff's bucket truck while Plaintiff was out on leave. *Id.* When Plaintiff arrived at work on October 5, 2012, another Verizon employee had her bucket truck. Morris Dep. 216:12-16, 217:2-8. Later, Contreras informed Plaintiff that she was not getting the truck back, as he was reassigning the truck to a different employee, *id.* 224:16-21, and this reassignment was "permanent," Morris Decl. ¶ 12. Mattos called Plaintiff, requesting her doctor's release, but she could not find it. Morris Dep. 228:8-229:5. Plaintiff used her personal truck to do some work, but went home after two hours. *Id.* 226:15-21, 231:21-24. Plaintiff extended her medical leave until March 14, 2013. *Id.* 231:21-232:2.

On November 1, 2012, Plaintiff filed an internal complaint regarding the bucket truck incident on October 5, 2012. Ex. WW, ECF No. 61-45. Llewellyn's investigation into the incident "failed to yield evidence that the actions that occurred on October 5, 2012 constituted discrimination or retaliation against Morris." Llewellyn Decl. ¶ 26. On December 2, 2012, Llewellyn emailed Plaintiff the results of the investigation. Ex. XX, ECF No. 61-46.

### 3. HR Conducts New Investigation and Plaintiff Returns to Aiea

Plaintiff returned to work on March 14, 2013, and chose to be assigned to Aiea rather than stay at 397. Ex. J, ECF No. 61-12; Mattos Decl. ¶ 29. This decision was consistent with her doctor's recommendation. Ex. H, ECF No. 61-11. At Aiea, Cathcart was once again her supervisor. Morris Dep. 236:15-17.

Before Morris returned to work, she sent HR signed statements from Verizon employee Harry Andaya ("Andaya"), dated March 5, 2013, and Verizon employee Van Tanabe ("Tanabe"), dated March 10, 2013. Llewellyn Decl. ¶ 29; Ex. II, ECF No. 61-37; Ex. JJ, ECF No. 61-38. The statements described the allegedly hostile working conditions Plaintiff endured at 397. Ex. II, ECF No. 61-37; Ex. JJ, ECF No. 61-38. For instance, Andaya writes that Verizon employees "made comments about [Plaintiff] being gay constantly," which he then told Plaintiff. Ex. II, ECF No. 61-37.

In April 2013, Llewellyn and Michelle Starks ("Starks") conducted a new investigation into Plaintiff's complaints. Llewellyn Decl. ¶ 32. Llewellyn and Starks interviewed Plaintiff, Andaya, Tanabe, Cathcart, Brown, Mattos, Contreras, and Gouveia, among others. *Id.* In a May 9, 2013 email to Plaintiff, Llewellyn explained how Verizon needed "to establish and clarify policies and procedures in a number of areas." Ex. KK, ECF No. 61-39. In addition, Llewellyn

recommended that an earlier unrelated three-day suspension from October 27, 2011 be rescinded and Plaintiff provided with back pay for the suspension. *Id.*; Llewellyn Decl. ¶ 35. The recommendations were adopted. *Id.* ¶ 36.

On May 25 and 27, 2013, Plaintiff emailed Lewellyn complaining about an incident on May 22, 2013. Ex. YY, ECF No. 61-47. Cathcart warned Plaintiff and her coworkers that they were "being watched for safety violations." *Id.* When Plaintiff later contacted Cathcart to get "a manhole entry sheet," Cathcart "flipped" and claimed their actions were a safety violation. *Id.* Lewellyn investigated and concluded that Cathcart was appropriately upset with Plaintiff and her male coworker for violating established safety procedures. Llewellyn Decl. ¶ 38; Ex. ZZ, ECF No. 61-48.

### 4. *Plaintiff Goes on Medical Leave for a Work-Related Physical Injury*

On June 17, 2013, Plaintiff went on medical leave after injuring her back when working in a manhole. Ex. CCC, ECF No. 61-50; Mattos Decl. ¶ 31.

### a. *Accommodating "Light Duty"*

Dr. Leonard N. Cupo ("Dr. Cupo") evaluated Plaintiff and completed a medical report, dated August 15, 2013. Ex. 1, ECF No. 73-1. Dr. Cupo concluded:

> [Plaintiff] is not totally disabled and can work full time
> limited duty as she completes further diagnostic testing

and treatment of . . . the injury of 6/17/13, with the
following restrictions:  no squatting, kneeling, or ladder
climbing; no driving a commercial vehicle; no standing
greater than 15 minutes without a five-minute sitting
break; and no lifting greater than 15 lbs.

*Id.*

In November 2013, Morris began communicating with Llewellyn, Verizon employee Cynthia Clark ("Clark"), and Verizon employee Linda Cerminaro ("Cerminaro"), through email and phone calls, regarding Plaintiff's possible return to work.  Ex. NN, ECF No. 61-41; Llewellyn Decl. ¶ 43.  On November 22, 2013, Cerminaro emailed Plaintiff to memorialize a phone conversation they had the day prior.  Ex. NN at 3, ECF No. 61-41.  In the email, Cerminaro lists all of Plaintiff's restrictions and states that Plaintiff "requested 'light duty' in some unspecified fashion."  *Id.*  She also writes that Plaintiff "openly stated that [she] could not return to work to perform [her] job at this time since basic tasks like getting in and out of the truck and walking on terrain would be very difficult."  *Id.*  Cerminaro determined that Plaintiff's "request for light duty does not have an end in sight, is open ended and unreasonable."  *Id.*

On November 26, 2013, Clark sent Plaintiff an email to follow up on their previous phone call.  *Id.* at 5.  Plaintiff forwarded the email to her attorney, Charles H. Brower ("Brower"), who told her to "[t]ell them you are represented by

counsel and you can not speak to them.  Tell them they can contact me."  *Id.* at 6.

It does not appear that Plaintiff replied to Clark's November 26, 2013 email.

On April 10, 2014, Cerminaro emailed Plaintiff a "follow up of [Verizon's] efforts to determine [Plaintiff's] return to work status."  *Id.* at 7.  In the email, Cerminaro details how Plaintiff's restrictions "were last evaluated on March 13, 2014," and included:

    1.    No lifting/carrying over 15 pounds.
    2.    No bending at the knees.
    3.    No work above chest height.
    4.    Must be able to lie down for 10 minutes for every hour spent working.
    5.    Only allowed to work up to four hours per day.

*Id.*  Cerminaro then expressed how Verizon could not reasonably accommodate Plaintiff's restrictions:

> Unfortunately, your request for some form of "light duty" assignment is not one that can be accommodated.  As you know, Verizon's operations in Hawaii are limited.  Its workforce in Hawaii consists almost exclusively of technicians and management.  There are no "light duty" technician assignments, nor are there any management positions that you are qualified to fill.

*Id.*

That same day, Plaintiff replied to Cerminaro and told her to "send all correspondence to Verizon Atty Petit and she can contact my Attorney."  *Id.* at 9.

Cerminaro emailed Plaintiff again on July 18, 2014, requesting an update on her

restrictions and a prognosis as to when they would be relaxed, *id.* at 12-13, and Plaintiff again told Cerminaro to contact Brower, *id.* at 12.

On January 6, 2015, Cerminaro emailed Plaintiff once again, listing Plaintiff's relatively unchanged restrictions and requesting a prognosis for "whether and when each of the above restrictions will be removed so that [Plaintiff] can perform the essential functions of [her] position." *Id.* at 21. The email states that it is enclosing a letter for Plaintiff's doctor, Dr. Frank Izuta ("Dr. Izuta"), requesting that he send Verizon his prognosis. *Id.* Plaintiff replied the next day, questioning a chart of job requirements Verizon sent to Dr. Izuta and requesting "a more accurate chart of the splicing or station positions at Verizon." *Id.*

On January 30, 2015, Cerminaro replied to Plaintiff's January 7, 2015 email. *Id.* at 20. In the email, Cerminaro notes that Verizon received Dr. Izuta's prognosis and that Plaintiff might be able to return to full duty work after "a six week course of work hardening." *Id.* Cerminaro goes on to "confirm[] that the charts accurately state the physical requirements of [Plaintiff's] position." *Id.* She then requests that Plaintiff "advise as to the status of [her] restrictions and return to work by March 3, 2015." *Id.* There is no record of a response to this email.

Dr. Izuta completed a "Workers' Compensation Treatment Plan," signed February 23, 2015, that outlines Plaintiff's rehabilitation program.  Ex. 16, ECF No. 68-3.  The plan includes a "schedule of measurable objectives" that lists two goals to reach by April 3, 2015: (1) Plaintiff going from carrying 43 pounds infrequently to carrying 60 pounds occasionally; and (2) Plaintiff going from squat lifting 35 pounds infrequently to squat lifting 60 pounds occasionally.  *Id.*

Mattos completed a "Job Analysis" report for Plaintiff's rehabilitation program, dated October 13, 2015.  Ex. 17 at 4-5, ECF No. 76-4.  In the report, Mattos checked boxes to indicate that Plaintiff's job required the ability to infrequently lift and carry over one hundred pounds.  *Id.* at 4.

By letter to Verizon, dated December 1, 2015, Plaintiff explains that she "had understood that all [she] needed to qualify for unrestricted return to work as Verizon required was . . . to be able to lift up to 60 pounds."  *Id.* at 1.  She then describes "a new form . . . from Gordon Mattos . . . that states [she has] to be able to lift up to 100+ pounds."  *Id.*  The letter requests a return to the sixty-pound lifting requirement.  *Id.* at 1-2.

Plaintiff sent a second letter to Verizon, dated January 8, 2016, updating her previous request to include additional information.  Ex. 18, ECF No.

69-1. First, she explains how "[a]n attorney for Verizon stated to [her] attorney on December 15, 2015 that the reason for the 100 pound lifting requirement was that manhole covers are heavy and are hard to dislodge sometimes." *Id.* She contests that, referencing how workers have tools available to dislodge heavy manhole covers. *Id.*

By letter dated January 22, 2016, Verizon employee Winsome Taik responded to Plaintiff's January 8, 2016 letter, including workplace accommodation forms for Plaintiff to complete. Ex. 19, ECF No. 69-2.

On March 1, 2016, Plaintiff performed a Functional Capacity Evaluation ("FCE"). Ex. 20, ECF No. 69-3. Although she passed most requirements, she failed the "Lift Floor to Waist Infrequent 100+ lbs." requirement because she could only lift "96 lbs." *Id.* As a result, the FCE concluded that Plaintiff was not qualified for full time, full duty work. *Id.*

Despite failing the FCE, Plaintiff returned to work without restriction on March 15, 2016. Llewellyn Decl. ¶ 52. Since her return to work, she does not claim to have experienced any unfair treatment. Morris Dep. 311:21-25.

**B. Procedural Background**

Plaintiff filed her Complaint on June 8, 2015, ECF No. 7-3, and Defendant filed a Notice of Removal from the Circuit Court of the First Circuit,

14

State of Hawaii, on July 13, 2015, ECF No. 1.  Plaintiff asserts four claims against

Defendant under federal and state law: (1) hostile work environment;

(2) retaliation; (3) disability discrimination; and (4) failure to investigate and

failure to prevent discrimination and harassment.  Compl.[2]

On March 7, 2017, Defendant filed its Motion for Summary

Judgment.  ECF No. 60.  Plaintiff filed her Opposition on April 10, 2017, ECF No.

64, and Defendant filed its Reply on May 1, 2017, ECF No. 86.  A hearing was

held on July 10, 2017.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party

who fails to make a showing sufficient to establish the existence of an element

essential to the party's case, and on which that party will bear the burden of proof

at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v.*

*Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

---

[2] At the July 10, 2017 hearing, Plaintiff's counsel clarified the Complaint, ECF No. 7-3, and stated that Plaintiff is not raising: (1) a sexual discrimination claim based upon an adverse employment action; or (2) any common law tort claim (such as negligent or intentional infliction of emotional distress).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.  DISCUSSION

### A.     Hostile Work Environment

Plaintiff alleges that the conduct of her Verizon coworkers and supervisors created a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e et seq. ("Title VII").  Compl. ¶¶ 39-43; Pl.'s Opp'n at 16-25.

"An employer is liable under Title VII for conduct giving rise to a hostile work environment where the employee proves (1) that [she] was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999). "The working environment must both subjectively and objectively be perceived as abusive," with the objective prong viewed from the "perspective of a reasonable [woman]."  *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995).  Further, "[i]n determining whether a work environment is sufficiently hostile, the court evaluates the totality of the circumstances."  *Fuller v. Idaho Dept't of Corr.*, 2017 WL 3223005, at *5 (9th Cir. July 31, 2017).

Employees can hold employers liable for the conduct of a supervisor or a coworker. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001). Where the harasser is a supervisor, the employer may be vicariously liable for his conduct. *Id.* But where the harasser is a coworker, "the plaintiff must prove that the employer was negligent, *i.e.* that the employer knew or should have known of the harassment but did not take adequate steps to address it." *Id.*

Plaintiff submitted myriad internal complaints to Verizon regarding the verbal conduct of her supervisors and coworkers. *See, e.g.*, Mattos Decl. ¶ 18 (November 4, 2011 complaint); Llewellyn Decl. ¶ 9 (March 26, 2012 complaint); Ex. O, ECF No. 61-17 (August 9, 2012 complaint); Ex. R, ECF No. 61-20 (August 23, 2012 complaint); Ex. WW, ECF No. 61-45 (November 1, 2012 complaint); Ex. YY, ECF No. 61-47 (May 25, 2013 complaint). Verizon investigated Plaintiff's complaints, and in some instances, disciplined the offending employees for their inappropriate comments. *See, e.g.*, Ex. FF, ECF No. 61-34; Ex. GG, ECF No. 61-35. Clearly, Plaintiff has met elements one and two.

As to element three, there is a genuine dispute of material fact as to whether "the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Pavon*, 192 F.3d at 908. Plaintiff's Declaration states:

18

From March 2011 to June of 2013, I was constantly
subjected to other discriminatory epithets based on both
my sex and my sexual orientation, as well as numerous
derogatory comments from fellow employees and
managers that they did not want to work with me, that I
should not be there, and other comments. Among these, I
specifically recall repeatedly hearing the terms, "bitch,"
"gay," "dyke," and "faggot" as being said in my
presence.

Morris Decl. ¶ 6 ("Paragraph Six"); *see also* Llewellyn Decl. ¶ 9 (Contreras

greeted Plaintiff and coworkers with "Good Morning, Men"); Ex. O, ECF No. 61-

17 (Chee, in Plaintiff's presence, made comments about Lewis being in a "gay

parade" and "bending him over"); Morris Dep. 145:23-146:16 (Cathcart yelled at

Plaintiff "I fucking bring you on my team. You fucking don't appreciate. You

better wake up.").

Defendant argues that Paragraph Six is insufficient to survive

summary judgment because it is (1) conclusory; and (2) a "sham" affidavit. Def.'s

Reply at 7. The court disagrees. First, a conclusory affidavit exists where it

"lack[s] detailed facts and any supporting evidence." *FTC v. Publ'g Clearing

House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). Here, Paragraph Six includes a

specific time frame and specific terms coworkers used toward her, and Plaintiff's

deposition references specific instances when they were used. Morris Decl. ¶ 6;

*see, e.g.*, Morris Dep. 106:24-108:16. Second, Plaintiff's Declaration is far from a

"sham affidavit," as "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009). Here, as just stated, Plaintiff's deposition sufficiently supports her affidavit. *See, e.g.*, Morris Dep. 107:1-3 ("[Cathcart] was calling me a bitch a lot, just singling me out, yelling at me in front of everybody, humiliating me, taunting.").

The allegations set forth in Paragraph Six, coupled with the other evidence presented, are enough for Plaintiff to survive summary judgment. At this stage, the court must weigh the evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. And, weighing Plaintiff's Declaration in Plaintiff's favor, and considering the totality of the evidence, a reasonable fact-finder could find that repeatedly being called "bitch," "gay," "dyke," and "faggot" by "fellow employees and managers" over a two-year period, in addition to the more specific instances of harassment set forth above, created a sufficiently hostile work environment to violate Title VII.[3]

---

[3] The court recognizes, in relation to some co-worker harassment, that Verizon took adequate steps (at least at times) as a corrective measure. Nonetheless, there is evidence -- viewed in the light most favorable to Plaintiff -- that Plaintiff's supervisors also created a hostile work environment for Plaintiff. Thus, under a totality of the circumstances, a reasonable woman could perceive Plaintiff's environment as sufficiently abusive. *See generally City of Oakland*, 47 F.3d at 1527.

As to Plaintiff's hostile work environment claim, Defendant's Motion is DENIED.

## B.    Retaliation

Plaintiff argues that Verizon retaliated against her, in violation of Title VII,[4] when Mattos permanently reassigned her bucket truck to another employee. Compl. ¶¶ 34, 40; Pl.'s Opp'n at 30-33.[5]

### 1.    McDonnell Douglas *Framework*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a useful and accepted framework to address Title VII discrimination and retaliation claims. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citing *Costa v. Desert Palace*, 299 F.3d 838, 855 (9th Cir. 2002) (en banc)). When responding to a summary judgment motion, the plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating" discriminatory or retaliatory intent. *Id.* That is, a plaintiff may respond by producing evidence "demonstrating that a

---

[4] Because Plaintiff's federal and state claims are analyzed under the same *McDonnell Douglas* framework, the court does not distinguish between the claims in its analysis. *See Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 69-70 (Haw. 2001).

[5] At the July 10, 2017 hearing, Plaintiff's counsel clarified that Plaintiff's retaliation claim is narrowly limited to the reassignment of her bucket truck to another employee, and she was not pursuing her work reassignment as a basis for her retaliation claim.

discriminatory [or retaliatory] reason more likely than not motivated the employer." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (quoting *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)). Here, the parties present their respective arguments under the traditional *McDonnell Douglas* framework.

Under Title VII, an employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's antiretaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation marks omitted)).

Within the traditional *McDonnell Douglas* framework for Title VII claims, a plaintiff first has the burden to establish a prima facie case for retaliation.

22

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). If a plaintiff

establishes a prima facie case, "the burden of production shifts to the defendant,

who must offer evidence that the adverse action was taken for other than

impermissibly [retaliatory] reasons." *Id.* Once the defendant fulfills this burden,

"the plaintiff must demonstrate that the employer's alleged reason for the adverse

employment decision is a pretext for another motive which is [retaliatory]." *Id.*

(quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985) (internal

quotation marks omitted)).

### 2.        *Plaintiff Fails the First Step of the* McDonnell Douglas *Framework*

Plaintiff fails at the first step of the *McDonnell Douglas* framework.

That is, she fails to establish a prima facie case of retaliation.

"To make out a *prima facie* retaliation case, [a plaintiff] ha[s] to show

that she engaged in protected activity, that she suffered a materially adverse action,

and that there was a causal relationship between the two." *Westendorf v. W. Coast

Contractors of Nev.*, 712 F.3d 417, 422 (9th Cir. 2013) (citing *Burlington N. &

Sante Fe Ry. Co.*, 548 U.S. at 57). And where the adverse action is a reassignment

of job duties, "[w]hether a particular reassignment is materially adverse depends

upon the circumstances of the particular case, and 'should be judged from the

perspective of a reasonable person in the plaintiff's position, considering all the

23

circumstances.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (finding that a reasonable jury could conclude a reassignment was materially adverse where the new duties were "more arduous and dirtier," the previous duties "required more qualifications, which is an indication of prestige," and the previous duties "were objectively . . . better" and "the male employees resented" for having them).

Here, Plaintiff complains about the reassignment of her "bucket truck." Bucket trucks have "a lift in the back" that allows technicians to do aerial work. Morris Dep. 229:14-23. At 397, Verizon technicians used both bucket trucks and vans. Morris Dep. 230:13-231:15. Because there were more technicians at 397 than bucket trucks, some employees had to use vans when they were not doing aerial work. Llewellyn Decl. ¶ 26. Although some employees were generally assigned to specific bucket trucks, other employees might use the assigned trucks if the other employees required their specialized equipment. Mattos Decl. ¶ 26.

On August 23, 2012, Plaintiff went on medical leave. Llewellyn Decl. ¶ 17. For several months prior to her medical leave, Plaintiff was informally assigned to a specific bucket truck. Contreras Dep. 102:3-19. On October 5, 2012, Plaintiff returned to 397 from medical leave without any advance notice. *See, e.g.*, Llewellyn Decl. ¶ 25; Mattos Decl. ¶ 25, 27; Morris Dep. 216:22-217:1. Upon her

24

return, Contreras informed her that he permanently reassigned her bucket truck to a different employee. Contreras Dep. 101:18-102:2; Morris Decl. ¶ 12. Without access to her specific bucket truck, Plaintiff used her personal truck for two hours before going home and extending her medical leave. Morris Dep. 226:15-21, 231:21-232:2. When she later returned from medical leave, she accepted a reassignment from 397 to Aiea, so that she never discovered what vehicle she *would have had* instead of her previously assigned bucket truck.

Plaintiff fails to show how the "permanent" reassignment of her bucket truck, Morris Decl. ¶ 12, was "a *materially* adverse action," *Westendorf*, 712 F.3d at 422 (emphasis added).[6] Specifically, there is no evidence that her job became "more arduous" or less "prestig[ious]," *Burlington Northern & Santa Fe Railway Co.*, 548 U.S. at 71, after losing that particular bucket truck. Although Plaintiff used her personal truck when she returned (without notice) on October 5, 2012, nothing in the record shows that Verizon failed to provide Plaintiff with an alternative vehicle, such as a van, to use instead of her personal truck. *Cf.* Ex. XX,

---

[6] For the purpose of Defendant's Motion, the court assumes that Plaintiff's complaints about sexual harassment were protected activity, and that the close proximity between Plaintiff's complaints and the bucket truck reassignment could certainly give rise to an inference of a causal relationship between the two. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.").

ECF No. 61-46 (email from Llewellyn to Plaintiff stating that Llewellyn's investigation found that "[w]hen you returned October 5 you were provided another vehicle that still enabled you to do your job"). And nothing in the record suggests that Plaintiff would have received a materially worse vehicle had she returned to 397 after her medical leave. *Cf.* Mattos Decl. ¶ 27 ("[D]ue to [Plaintiff]'s seniority, she would very likely have received a new, higher quality truck upon receipt of an upcoming truck delivery."). And Plaintiff's claim that the "loss of the truck impacted my ability to do my job that I was being trained for at the time," Morris Decl. ¶ 12, provides her no support. She worked only a few hours on October 5, and was transferred to Aiea upon her return to work (and there is no evidence that bucket trucks were used or necessary at Aiea).

Simply put, Plaintiff has failed to establish what Verizon reassigned her to, or how that reassignment was materially worse than her previously assigned bucket truck. *See, e.g.*, *Aki v. Univ. of Cal. Lawrence Berkeley Nat'l Lab.*, 74 F. Supp. 3d 1163, 1181 n.7 (N.D. Cal. 2014) ("The Court is also persuaded that Plaintiff's purported loss of an assigned truck is an adverse action, as such a loss would make it much more difficult for Plaintiff to get to job sites around LBNL's 200-acre property.").

Plaintiff has not established that the permanent reassignment of her bucket truck was a materially adverse action, and as a result, has failed to establish a prima facie case of retaliation -- the first step of the *McDonnell Douglas* framework. As to Plaintiff's retaliation claim, Defendant's Motion is GRANTED.

## C.    Disability Discrimination

Plaintiff further argues that Verizon discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101.[7] There appears to be two separate allegations regarding ADA violations: (1) Verizon failed to provide a reasonable accommodation by not hiring Plaintiff in a "light duty" capacity during the period when Plaintiff was recovering from her injury; and (2) Verizon failed to constructively engage in the interactive process by arbitrarily changing Plaintiff's work requirements, delaying the date when Plaintiff could return to "full duty." Pl.'s Opp'n at 33-40. The court first sets out the legal framework for disability discrimination under the ADA, and then addresses Plaintiff's allegations in turn.

---

[7] Plaintiff also brings state law claims for disability discrimination under HRS § 378-2. Compl. ¶ 1. Because the Hawaii statutes are textually similar to the ADA, Hawaii courts adopt the federal analysis of ADA claims. *See French v. Haw. Pizza Hut, Inc.*, 99 P.3d 1046, 1051 (Haw. 2004). As a result, the court's analysis does not distinguish between federal and state disability discrimination claims.

### 1.    *Legal Framework*

The ADA states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A).

To establish a prima facie case for failure to accommodate under the ADA, a plaintiff must show that: "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability."  *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003).  And "[o]nce an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement

28

appropriate reasonable accommodations." *Humphrey v. Mem'l Hosp. Ass'n*, 239

F.3d 1128, 1137 (9th Cir. 2001).

### 2.    *Failure to Hire Plaintiff in a "Light Duty" Capacity*

Plaintiff first contends that Verizon could have reasonably

accommodated her by hiring her in a "light duty" capacity while she recovered

from her injury.  Pl.'s Opp'n at 35-36.  Because there was no "light duty" job

available for Plaintiff to perform, the court disagrees.

Plaintiff suffered her physical injury on June 17, 2013.  Ex. CCC,

ECF No. 61-50.  Dr. Cupo's medical report, dated August 15, 2013, listed the

following limitations on Plaintiff's ability to work:

> [Plaintiff] is not totally disabled and can work full time
> limited duty as she completes further diagnostic testing
> and treatment of . . . the injury of 6/17/13, with the
> following restrictions:  *no squatting, kneeling, or ladder
> climbing; no driving a commercial vehicle; no standing
> greater than 15 minutes without a five-minute sitting
> break; and no lifting greater than 15 lbs*.

Ex. 1, ECF No. 73-1 (emphasis added).  In an email to Plaintiff, dated November

22, 2013, Cerminaro lists Plaintiff's limitations as Verizon understood them:

> Restrictions as of 11-25-13
> Work 4 hrs. a day
> Lifting and Carrying -- 15 lbs. occasionally, 7-8 lbs.
> frequently
> Sit 20-30 min without a break - duration as tolerated
> Stand 5-10 min. without a break - total duration 3 hrs.

> Walk 5-10 min. without a break - total duration 1 hr.
> Bend and twist at waist rarely
> Bend at knees not at all
> Work above the waist not at all
> 5 min. break for every 15 min. stand and walking
> Must be able to lie down for 10 min. every hour

Ex. NN at 3, ECF No. 61-41. In a follow-up email to Plaintiff, dated April 10, 2014, Cerminaro listed Plaintiff's limitations as Verizon understood them, according to an evaluation on March 13, 2014:

> 1. No lifting/carrying over 15 pounds.
> 2. No bending at the knees.
> 3. No work above chest height.
> 4. Must be able to lie down for 10 minutes for every hour spent working.
> 5. Only allowed to work up to four hours per day.

*Id.* at 7. This email went on to address Plaintiff's request for "light duty":

> Unfortunately, your request for some form of "light duty" assignment is not one that can be accommodated. As you know, Verizon's operations in Hawaii are limited. Its workforce in Hawaii consists almost exclusively of technicians and management. There are no "light duty" technician assignments, nor are there any management positions that you are qualified to fill.

*Id.*

Plaintiff has failed to show how she could have performed the essential functions of her job despite these extensive physical limitations. In her Opposition, Plaintiff argues that Verizon could have accommodated Plaintiff

because Verizon had "a policy of providing light duty . . . as [Plaintiff's] own supervisor testified he would purposely not assign certain workers to go down into the manhole or do other heavy tasks if he didn't think they could do it." Pl.'s Opp'n at 36. To be specific, Contreras discussed how he did not make some technicians go into manholes because they were old or too big to fit. Contreras Dep. 107:15-108:13. But this only suggests that entering manholes was not an essential function of Plaintiff's job and that a very minimal accommodation was offered to some employees -- it does not show that someone with Plaintiff's physical limitations could still perform a technician's essential functions.

Plaintiff's physical limitations are clearly greater than those of someone who is too large to enter a manhole. For example, Plaintiff admitted to Llewellyn (on a November 21, 2013 phone call discussing how Verizon could accommodate Plaintiff) that "she was unable to return to work at that time, as she would have difficulty getting in and out of the work truck due to her constant pain." Llewellyn Decl. ¶ 46.

Moreover, Verizon investigated whether there were any positions that could accommodate Plaintiff's "light duty" request, and found that no such position existed. *Id.* ¶ 43; *see also* Ex. NN at 7, ECF No. 61-41 (email to Plaintiff explaining that the only positions in Hawaii were management and technicians,

and Plaintiff was unqualified for management and physically incapable of being a technician). And Verizon was not required to create a new "light duty" position to accommodate Plaintiff. *See Wellington v. Lyon Cty. Sch. Dist.*, 187 F.3d 1150, 1155 (9th Cir. 1999) ("[T]he ADA does not impose a duty to create a new position to accommodate a disabled employee."); *Taylor v. Dep't of the Air Force*, 585 F. App'x 381, 382-83 (9th Cir. 2014); *see also Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 419 (5th Cir. 2017) ("Even if he was capable of performing the work, Moss would still need to provide evidence supporting a finding that there was a light duty position available to be filled, which he did not do.").

Because Plaintiff has failed to show that she could have performed the essential functions of her job, or any other job at Verizon for which she was qualified, Defendant's Motion is GRANTED as to the disability discrimination claim regarding a failure to accommodate Plaintiff's "light duty" request.

### 3. *Raising Plaintiff's Lifting Requirements*

Plaintiff next argues that Verizon failed to engage in the interactive process in good faith when it delayed her return to work by increasing Plaintiff's lifting requirements. Pl.'s Opp'n at 37-39. Because there is a genuine issue of

material fact as to whether Verizon engaged in the interactive process in good faith, the court DENIES Defendant's Motion as to this claim.

"The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Humphrey*, 239 F.3d at 1137; *see also id.* ("A party that obstructs or delays the interactive process is not acting in good faith.") (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). If an employer fails to engage in the interactive process in good faith, it "face[s] liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). Additionally, "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." *Id.*

Here, there is evidence that Verizon originally required (or, at least, expected) Plaintiff to be able to lift sixty pounds before returning to work full time, full duty. *See* Ex. 16, ECF No. 68-3 (rehabilitation program, dated February 23,

2015, setting sixty pounds as the objective).[8]  Some months later, after Plaintiff

began her work hardening program, Mattos completed a "Job Analysis" report that

increased the lift requirement to one hundred pounds.  Ex. 17 at 4-5, ECF No. 76-4

(report dated October 13, 2015).  After this change, Plaintiff sent two letters to

Plaintiff, requesting an explanation for the change and a reversion back to the

sixty-pound requirement.  *Id.* at 1 (letter dated December 1, 2015); Ex. 18, ECF

No. 69-1 (letter dated January 8, 2016).  There is no evidence that Verizon ever

explained the change, or reverted the requirement back to sixty pounds.  Rather,

Verizon permitted Plaintiff to return to work on March 15, 2016, without

restriction, despite the fact that Plaintiff failed to pass the one-hundred-pound lift

requirement two weeks earlier.  *See* Llewellyn Decl. ¶ 52; Ex. 20, ECF No. 69-3.

Consequently, there is evidence that Verizon effectively delayed the

interactive process by raising Plaintiff's lift requirement from sixty to one hundred

pounds.  And because a party that delays the interactive process is not acting in

---

[8] Although Dr. Izuta's rehabilitation program for Plaintiff does not explicitly state that
Verizon set the goals for Plaintiff to reach before her return to work, there is circumstantial
evidence that Verizon indeed set the goals.  *See, e.g.*, Ex. NN at 27, ECF No. 61-41 (email from
Plaintiff to Cerminaro, dated January 7, 2015, questioning the accuracy of the "requirements on
[Verizon's] chart" given to Dr. Izuta); *id.* at 26 (email from Cerminaro to Plaintiff, dated January
30, 2015, confirming that "the charts [Verizon] sent to Dr. Izuta" do "accurately state the
physical requirements of [Plaintiff's] position"); Ex. 17, ECF No. 76-4 (Plaintiff's letter to
Verizon, dated December 1, 2015, explaining that she understood Verizon set a sixty-pound
lifting requirement).  And Verizon has not offered any evidence to suggest that it did not set the
original sixty-pound lifting requirement for Dr. Izuta.

good faith, *Humphrey*, 239 F.3d at 1137, there is a genuine dispute of material fact as to whether Verizon engaged in good faith. It is unclear if the raised lifting requirement *actually* delayed Plaintiff's ability to return to work (and if it did, the length of the delay), and that is an issue that shall be determined at trial.

Because there is a genuine dispute of material fact as to whether Verizon engaged in the interactive process in good faith, Defendant's Motion is DENIED as to the claim regarding the lift requirement increase.

## D.    Failure to Investigate and Failure to Prevent

Lastly, Plaintiff alleges claims for failure to investigate and failure to prevent discrimination and harassment in violation of Title VII. Compl. ¶ 50. At the July 10, 2017 hearing, counsel for both parties agreed that these claims are predicated on Plaintiff's harassment and discrimination claims. That is, they only survive to the extent that Plaintiff's harassment and discrimination claims survive. Thus, the court GRANTS Defendant's Motion as to claims predicated on retaliation and failure to provide Plaintiff a "light duty" job, and DENIES Defendant's Motion as to claims predicated on hostile work environment and increasing the lifting requirements for Plaintiff's return to full time.

# V. **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF No. 60, is GRANTED as to Plaintiff's federal and state claims for retaliation and failure to provide Plaintiff a "light duty" job, and DENIED as to Plaintiff's federal and state claims for hostile work environment and increasing the lifting requirements for Plaintiff's return to full time.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 3, 2017.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Morris v. Verizon Fed., Inc.*, Civ. No. 15-00261 JMS-KSC, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, ECF No. 60